UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

SCOTT J. HARTMAN                                                      PLAINTIFF

v.                                                  CIVIL ACTION NO. 3:12-CV-768-DW

CAROLYN W. COLVIN,
COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION              DEFENDANT

**MEMORANDUM OPINION**

        Plaintiff Scott J. Hartman has filed a complaint pursuant to 42 U.S.C. §405(g) to

obtain judicial review of a final decision of the Commissioner of Social Security that denied his

current applications for disability insurance benefits (DIB) and supplemental security income

(SSI).[1]  Hartman applied for DIB and SSI on August 12, 2011, alleging that he was disabled as

of January 1, 2008, due to degenerative disk disease in the cervical and lumbar spine, nerve

damage and swelling in the right leg, attention deficit-hyperactivity disorder, and mood swings

_____

        [1]  Hartman previously applied for DIB on July 1, 1999, alleging disability as of Sept. 8,
1998 (Tr. 91).  Before that he had received a closed period of disability from Aug. 4, 1996, to
Sept. 15, 1997, based on an earlier application filed in March of 1997, that alleged a disability
onset date of Aug. 4, 1996 (Id.).
        On May 25, 2001, ALJ Donald Campbell entered an unfavorable decision that denied the
1999 application. (Tr. 88-102).  In his hearing decision Judge Campbell found that Hartman had
severe impairments of:   dysthymic disorder; dependent personality disorder; status post-cervical
fusion with chronic pain; degenerative disk disease of the lumbar spine; a history of thoracic
outlet compression; and, a history of osteomyelitis of the right leg(Tr. 101). ALJ Campbell found
that these severe impairments did not satisfy the listing of impairments in App. 1, Subpart P,
Reg. No. 4 (Id.).  He further determined that Hartman's testimony concerning his limitations was
not totally credible (Id.).
         Although ALJ Campbell found Hartman unable to resume his past relevant work, he
concluded that Hartman retained the residual functional capacity to perform light and sedentary
work with a sit/stand option, but no overhead work, work with vibrating tools, constant repetitive
use of the hands, fine eye/hand coordination, and no climbing of ropes or ladders (Id.).  ALJ
Jacobs also limited Hartman to simple, repetitive, low stress jobs with no close interaction with
the public (Id.).  With these limitations Hartman was determined to retain the residual functional
capacity to perform alternative jobs such as packer, security monitor, office helper and
production inspector (Tr. 102).

(Tr. 288).  The Commissioner denied Hartman's claims on initial consideration (Tr. 103-114,

115-126) and on reconsideration (Tr. 168-170, 171-173).  Hartman requested a hearing before an

Administrative Law Judge (ALJ) (Tr. 174-76).

ALJ George A. Jacobs conducted a hearing in Louisville, Kentucky, on July 17,

2012 (Tr. 36-72).  Hartman attended with his attorney, Alvin Wax (Tr. 36).  Hartman and

vocational expert (VE) Robert Piper testified at the hearing (Tr. 41-64, 65-72).  Following the

conclusion of the hearing, ALJ Jacobs entered a hearing decision on July 26, 2012, that found

Hartman is not disabled for the purposes of the Social Security Act (Tr. 20-31).

In his adverse decision, ALJ Jacobs made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through September 30, 2010.

2. The claimant has not engaged in substantial gainful activity since January 1, 2008, the alleged onset date (20 C.F.R. 404.1571, *et seq.* and 416.971, *et seq.*).

3. The claimant has the following severe impairments: lumbar degenerative disk disease with radiculopathy, cervical degenerative disk disease with radiculopathy, and bipolar/anxiety/attention deficit/post-traumatic stress disorders (20 C.F.R. 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light and sedentary work as defined in 20 C.F.R. 404.1567(a, b) and 416.967(a, b) except with a sit/stand option with at least 30 minutes in a position with the use of a cane to ambulate; occasional posturals but never climb ladders/ropes/scaffolds, kneel or crawl; avoid hazards (e.g. machinery, heights), vibration, bright or pulsating lights (due to headaches alleged at hearing); overhead reaching; no push/pull with the lower extremities; simple, repetitive tasks; no production rate pace work but rather goal-oriented; occasional contact with co-workers and supervisors; and no contact with the public.

2

6.      The claimant is unable to perform any past relevant work (20 C.F.R. 404.1565 and 416.965).

7.      The claimant was born on July 8, 1959, and was 48-years-old, which is defined as a younger individual age 18-49, on the alleged disability onset date.  The claimant subsequently changed age category to closely approaching advanced age (20 C.F.R. 404.1563 and 416.963).

8.      The claimant has at least a high-school education and is able to communicate in English (20 C.F.R. 404.1564 and 416.964).

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferrable job skills (See SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appx. 2).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R. 404.1569, 404.1569(a), 416.969 and 416.969(a)).

11.     The claimant has not been under a disability, as defined in the Social Security Act, from January 1, 2008, through the date of this decision (20 C.F.R. 404.1520(g) and 416.920(g)).

(Tr. 22-30).  Hartman sought review of the hearing decision by the Appeals Council (Tr. 14-16).

The Appeals Council denied his/her request for review, finding no reason under the Rules to

review ALJ Jacobs' decision (Tr. 1-6).  The present lawsuit followed.


**The Five-Step Sequential Evaluation Process.**

Before the Court can address the arguments raised by Hartman in his fact and law

summary, it first must set forth certain fundamental principles involved in the determination of

disability.  Disability is defined by law as being the inability to do substantial gainful activity by

reason of any medically determinable physical or mental impairment which can be expected to

result in death, or which has lasted or can be expected to last for a continuous period of not less

3

than 12 months.  See, 20 CFR §§ 404.1505, 416.905(a).  To determine whether a claimant for DIB or SSI benefits satisfies such definition, a 5-step evaluation process has been developed.  20 CFR §§ 404.1520, 916.920(a).  At step 1, the Commissioner must determine whether the claimant is currently engaged in substantial gainful activity; if so, the Commissioner will find the claimant to be not disabled.  See, 20 CFR §§ 404.1520(a)(4)(i), 416.920(a)(4)(ii), 416.971.  *See, Dinkel v. Secretary*, 910 F2d, 315, 318 (6th Cir. 1990).

If the claimant is not working, then the Commissioner next must determine at step 2 of the evaluation process whether the claimant has a severe impairment or combination of severe impairments that significantly limit his or her ability to perform basic work activities.  See 20 CFR §§ 404.1520(a)(4)(ii),  416.920(a)(4)(ii).  If the impairments of the claimant are determined by the Commissioner to be non-severe, in other words, so slight that they could not result in a finding of disability irrespective of a claimant's vocational factors, then the claimant will be determined to be not disabled at step 2.  *See, Higgs v. Bowen*, 880 F.2d 960, 962 (6th Cir. 1988); *Mowery v. Heckler*, 771 F.2d 966, 971-72 (6th Cir. 1985).

If the claimant has a severe impairment or impairments, then the Commissioner at step 3 of the process will determine whether such impairments are sufficiently serious to satisfy the listing of impairments found in Appendix 1 of Subpart B of Part 404 of the federal regulations.  20 CFR §§ 404.1520(A)(4)(iii), 416.920(a)(4)(iii) The claimant will be determined to be automatically disabled without consideration of his or her age, education or work experience if the claimant's impairments are sufficiently severe to meet or equal the criteria of any impairment listed in the Appendix.  *See*, *Lankford v. Sullivan*, 942 F.2d 301, 306 (6th Cir. 1991); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

4

When the severity of the claimant's impairments does not meet or equal the listings, then the Commissioner must determine at step 4 whether the claimant retains the residual functional capacity (RFC) given his or her impairments to permit a return to any of his or her past relevant work.  20 CFR §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).  *See, Smith v. Secretary*, 893 F.2d 106, 109-110 (6th Cir. 1989).  A claimant who retains the residual functional capacity, despite his or her severe impairments, to perform past relevant work is not disabled. 20 CFR §§ 404.1560(b)(3), 416.960(b)(3)  The burden switches to the Commissioner at step 5 of the sequential evaluation process to establish that the claimant, who can not return to his or her past relevant work, remains capable of performing alternative work in the national economy given his or her residual functional capacity, age, education and past relevant work experience. See, 20 CFR §§ 404.1520(a)(4)(v), 404.1560( c ), 416.920(a)(4)(v), 416.960( c ); *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994); *Herr v. Commissioner*, 203 F.3d 388, 391 (6th Cir. 1999).  Collectively, the above disability evaluation analysis is commonly referred to as the "5-step sequential evaluation process."


**Standard of Review.**

Review of a disability decision of the Commissioner is governed by 42 U.S.C. § 405(g).  The statute, and case law that interprets it, require a reviewing court to affirm the findings of the Commissioner if they are supported by substantial evidence and the Commissioner has employed the appropriate legal standard.  *Walters v. Commissioner of Social Security*, 127 F.3d 525, 528 (6th Cir. 1997) ("This Court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal

standards or has made findings of fact unsupported by substantial evidence in the record.).

Substantial evidence is defined by the Supreme Court to be "such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402

U.S. 389, 401 (1971).  *See also, Lashley v. Sec'y of HHS*, 708 F.2d 1048, 1053 (6th Cir. 1983)

(citing *Perales*).  It is more than a mere scintilla of evidence or evidence that merely creates the

suspicion of the existence of a fact, but must be enough evidence to justify a refusal to direct a

verdict if the matter were tried to a jury.  *Sias v. Sec'y of HHS*, 861 F.2d 475, 479 n. 1 (6th Cir.

1988).

   The substantiality of the evidence is to be determined based upon a review of the

record taken as a whole, not simply some evidence, but rather the entirety of the record to

include those portions that detract from its weight.  *Garner v. Heckler*, 745 F.2d 383, 387 (6th

Cir. 1984); *Laskowski v. Apfel*, 100 F. Supp.2d 474, 482 (E.D. Mich. 2000).  So long as the

decision of the Commissioner is supported by substantial evidence, it must be upheld by the

federal court even if the record might support a contrary conclusion.  *Smith v. Sec'y of HHS*, 893

F.2d 106, 108 (6th Cir. 1989).  The substantial evidence standard "presupposes that there is a

zone of choice within which decision makers can go either way, without interference from the

courts."  *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (*en banc*).

**Background Information.**

   We begin our consideration of Hartman's case with an overview of the material

facts of his personal, social and medical history.  Hartman was born July 8, 1959 (Tr. 41, 189).

He stands 5'10" tall and weighs 183 lbs (Tr. 45).  At the time of the hearing, he was 53 years old,

divorced and living alone in rent subsidized housing (Tr. 42).  Hartman has a high school

education, but no formal vocational training or military experience (Tr. 43-44).  His past relevant

work includes employment as a cashier, a hand packager and security alarm installer (Tr. 65-66,

288-290).  Hartman testified that he has not worked for more than a day since the alleged onset

date of his disability on Jan. 1, 2008 (Tr. 45).

Hartman described his physical problems at the hearing before ALJ Jacobs on

July 17, 2012  (Tr. 46-51).  He explained that he has problems with both of his legs, his back and

neck (Tr. 46-47).  He experiences daily leg pain that he estimates to be rated at 6-7 on a 10-point

scale.  The pain is sometimes worse when he stands too long or walks excessively (Tr. 47).

Hartman estimated that he can stand for approximately 30 minutes and walk a block and a half

without experiencing substantial pain.  According to him, elevation of his legs helps to relieve

the pain (Tr. 48).

Hartman also experiences pain in his back due to his disk problems.  He described

this back pain as a dull ache that rates a 3-4 out of 10 on the pain scale (Tr. 48).  Too much

standing, sitting or lying down will increase his back pain (Id.).  Hartman estimated that he can

stand for 30-40 minutes, sit for an hour and lay down for 2-3 hours before his back pain starts

(Tr. 29).  Heat, showers and relaxation help him to relieve this pain (Id.).

Hartman has constant pain in his neck, which "hurts pretty bad all the time."

(Id.).  He estimated his neck pain to be 5-6 on the same 10-point pain scale.  Turning his neck or

looking up and down increase the neck pain (Id.).  Relaxation reduces it (Tr. 50).  Other than his

neck, leg and back pain, Hartman denied any other physical problems during questioning by the

ALJ (Tr. 50).  His doctors have limited him to lifting no more than 5-15 lbs and have told him to

avoiding excessive bending or standing.  (Id.).  Hartman testified that his physical condition had not changed significantly in the six months prior to the July, 2012 hearing.  He has attempted physical therapy in the past, but it only helped for a short period of time (Tr. 51).  Hartman's pain medications, in particular Seroquel, which he takes at night, make him sleepy (Tr. 51)

Hartman also testified at the administrative hearing about his mental health problems (Tr. 52-60).  He has been treated for anxiety, stress and depression (Tr. 52).  He takes medications for these conditions and reported being hospitalized at "Wellsprings" for emotional problems for two weeks during the year prior to the hearing[2] (Id.).  Hartman does receive treatment with a therapist once a month, and at the time of the hearing had been in counseling for a year (Tr. 53).

On a typical day, Hartman rises early, makes his breakfast, watches tv, does his personal hygiene and decides what he is going to do (Tr. 53, 54).  On a "bad day,"  Hartman stays to himself and will just sit or lie down if his mind is racing or he can't concentrate (Tr. 54).  Hartman estimated that he has two or three such bad days a week (Tr. 55).  Nevertheless, he is able to prepare his own meals, watch tv, use public transportation, shop for himself and go to the library where he enjoys reading books about military history (Tr. 55-58).

Hartman also is able to dress himself, do his own laundry, operate a dishwasher and microwave, sweep the floor, manage his own finances and visit with friends.  (Tr. 56-59).  Hartman has several friends who do come to visit him two or three times a week; otherwise, he

---

[2] No medical treatment records document any in-patient psychiatric treatment during the time following the alleged onset date of Hartman's disability in January of 2008. The transcript reference to "Wellsprings" indicates that the transcriber has spelled the name phonetically.  (Tr 52).

belongs to no social organizations, clubs or churches (Tr. 59).

During the hearing, Hartman explained that his neck, back and leg pain, along with his psychological problems, would prevent him from performing any jobs that required physical activity such as sweeping or cleaning (Tr. 60). His neck pain is related to a 3-level fusion surgery that he needed after a water skiing accident in 1999 (Tr. 60). Surgeons installed a cage and plate in his neck, along with six screws (Tr. 61). Hartman also suffered severe compound fractures to his right lower leg following a motorcycle accident in 1976 that left him with a shortened right leg and a crushed right foot that he can barely lift with his ankle (Tr. 61). This foot injury, according to Hartman, causes him significant problems with walking, as well as, a lot of pain (Id.). More recently in mid-April of 2011 he suffered a grease fire burn to his lower right leg (Id.).

Along with these prior injuries, he related a history pancreatitis and headaches (Tr. 62). Hartman takes Imitrex for his headaches because his head "hurts all the time." (Id.). The headaches include migraines that occur irregularly, but at least two or three times a month (Tr. 62-63). Hartman had been homeless for awhile in 2011, and that while homeless he got almost all of his medical treatment at the hospital emergency room (Tr. 63). Prior to the hearing, however, he began to receive ongoing medical treatment at the Phoenix Health Center, a medical facility for indigent patients (Tr. 63).

Review of the medical records does confirm numerous emergency room visits in the years immediately prior to the hearing. Hartman was treated on a total of 77 occasions at the University of Louisville Hospital emergency room (Tr. 523-524, 540-561, 591-751), Norton Audubon Hospital emergency room (Tr. 318, 522), Jewish Hospital emergency room (Tr. 562-

9

590, 752-784), the Norton Hospital emergency room (Tr. 785-816), along with the Louisville Hospital Pain Clinic (Tr. 838-844).  He also received treatment, as noted, at the Phoenix Health Center (Tr. 525-539, 817-38).

Many of these emergency room visits were for the treatment of chronic neck, back or leg pain, and were treated primarily with muscle relaxants and pain medications such as Flexeril, Diclofenic and/or Prednisone.[3]  Harman also received emergency room treatment for various other conditions including treatment for acute pancreatitis[4], headaches[5] and first and second degree burns to his lower right leg.[6]

In addition to the above-described emergency room treatment, all of which occurred at the University of Louisville Hospital during 2010-2011[7], Hartman also received treatment from late November of 2010 through May of 2011, at the Norton Audubon Hospital emergency room,[8] where he was treated for ongoing dental problems[9], chronic low back and leg

---

[3] (Tr. 750-751, 744-745, 742-743, 740-741, 738-739, 729-730, 718-720, 677-678, 671-672, 669, 667-668, 665-666, 659-660, 644-650, 637-640, 633-635, 631-633, 629-630, 627-628, 625-626, 623-624, 621-622, 619-620, 615-616, 613-614, 609-610, 601-602, 598-599).

[4] (Tr. 711-717, 702-706, 694-699, 307-316).

[5] (Tr. 655-658, 603-604).

[6] (Tr. 692-693, 688-689, 686-687, 684-685, 682-683, 680-681, 677-678, 673-676, 671-672, 669-670).

[7] (Tr. 307-317, 591-751).

[8] (Tr. 318-522).

[9] (Tr. 318-349).

pain,[10] stomach and chest pain,[11] and first and second degree grease burns to lower right leg.[12] Hartman's emergency room treatment records from Jewish Hospital[13] reflect treatment from January of 2011 through April of 2012.  During this time, Hartman received treated for complaints of low back and neck pain,[14] shoulder and elbow pain,[15] and burn-related pain in his lower right leg.[16]

        During his emergency room treatment, various diagnostic imaging studies were performed on Hartman on multiple occasions.  For example, after a slip-and-fall on the ice in February of 2010, x-ray images of Hartman's left shoulder and ribs revealed no rib fractures, no left shoulder fractures or wrist fractures, nor acute cardiopulmonary disease (Tr. 747-749).  After he was injured again while riding an ATV in June that year, Hartman received a CT scan of his cervical spine, which showed no evidence of acute fracture or dislocation (Tr. 734-736).  The CT scan did confirm, however, the prior placement of an anterior plate and screw, along with intervertebral cage fusion of the C5-C7 vertebral bodies, a procedure that Hartman underwent after the above-noted 1999 waterskiing accident (Tr. 736).  Two months later in August of 2010, another CT scan of the cervical spine was performed after Hartman injured his neck while

---

[10] (Tr. 351-364, 366-377).

[11](Tr. 378-427).

[12](Tr. 429-522).

[13](Tr. 562-590, 752-784).

[14] (Tr. 562-565, 566-570, 571-575, 587-590, 753-756, 757-761, 762-766, 771-776, 777-782).

[15](Tr. 576-581).

[16] (Tr. 582-586).

wrestling with his son (Tr. 729-731).  This diagnostic imaging revealed no significant changes since the earlier cervical CT scan performed that June (Tr. 731-736).

After Hartman fell 10-feet off a roof that he was standing on in November of 2010, a substantial amount of diagnostic imaging was performed at the U of L Hospital (Tr. 718-728).  X-ray examination of Hartman's chest revealed no acute abnormalities with only the post-surgical changes noted in the lower cervical spine (Tr. 721).  Diagnostic imaging of the pelvis revealed no evidence of acute fracture or dislocation and no unusual soft tissue calcifications or radiopaque foreign bodies (Tr. 742).  Views of the thoracic spine showed only some diffuse osteopenia[17] with multi-level degenerative changes in the lower thoracic spine, but no acute fracture or mal-alignment (Tr. 723).  Oblique and lateral views of Hartmans' right ankle showed the bones to be diffusely osteopenic with a deformity in the distal shaft of the fibula, along with an old healed fracture resulting in moderate lateral displacement of the distal fragment, but no acute fracture or dislocation, only the healed tibial and fibular shaft fractures (Tr. 724).  Imaging of the right knee and ankle confirmed an old healed fracture with no acute fracture or dislocation (Tr. 725).

Imaging of the lumbar spine on that occasion revealed a lumbarized S1[18] with some narrowing of the disk space between the L1-L2, with the other lumbar disks appearing to

---

[17] "Osteopenia is a condition where bone mineral density is lower than normal. It is considered by many doctors to be a precursor to osteoporosis."
http://en.wikipedia.org/wiki/Osteopenia (Last visited May 21, 2013).

[18] "'Lumbarization' is a term that refers to an anatomic anomaly in the human spine. It is defined by the nonfusion of the first and second segments of the sacrum. The lumbar spine subsequently appears to have six vertebrae or segments, not five. Conversely the sacrum appears to have only four segments instead of its designated five segments."
http://en.wikipedia.org/wiki/Lumbarization (Last visited May 21, 2013).

be normal (Tr. 726).  Some narrowing of the disk between the T11-T12 also was revealed, but no vertebral body compressions (Id.).  No acute findings were noted, and only some disk space narrowing, but no acute abnormality was revealed at the T11-T12 and L1-L2 (Id.).  X-rays of Hartman's right foot showed deformity due to a prior trauma, along with generalized osteopenia likely related to diminished activity and a subacute fracture of the great toe (Tr. 727).  Mild generalized osteopenia was revealed in diagnostic imaging of the right tibia and fibula, but no evidence of acute fracture or dislocation (Tr. 728).

        In January of 2011, after complaining of abdominal pain, Harman underwent a right upper quadrant ultrasound to address a diagnosis of pancreatitis[19] (Tr. 709-714).  The ultrasound was essentially negative with a normal gallbladder, liver and kidney image (Tr. 709).  An abdominal CT scan performed at the same time revealed clear lung bases along with a normal liver, spleen, pancreas, kidneys, gallbladder and adrenal glands (Tr. 707).  The CT scan revealed no evidence of inflammatory changes in the pancreas or fluid collections to indicate complications from pancreatitis (Id.).  At most, only a small hiatal hernia was revealed (Tr. 708).

        On several other occasions, Hartman had diagnostic imaging of his spine performed.  He underwent an MRI of the lumbar spine in July of 2011 (Tr. 523-524), after having x-rays taken of the lumbar spine in November of 2010 (Tr. 648-649).  As earlier noted, both these imaging studies revealed transitional anatomy with a lumbarized S1 vertebrae along

---

        [19] "Pancreatitis is inflammation of the pancreas. It has several causes and symptoms and requires immediate medical attention. It occurs when pancreatic enzymes (especially trypsin) that digest food are activated in the pancreas instead of the small intestine. It may be acute—beginning suddenly and lasting a few days, or chronic—occurring over many years. http://en.wikipedia.org/wiki/Pancreatitis (Last visited May 21, 2013).

with mild multi-level degenerative changes consisting primarily of degenerative disk disease at the L1-L2, L2-L3 and L5-S1 with no significant neural forminal or spinal canal narrowing, along with mild/moderate right L4-L5 facet arthropathy[20] (Tr. 523-534, 648-649).

After Hartman received burns to his lower right leg, a venous Doppler exam of his lower right leg was performed in April of 2011 (Tr. 463).  Doppler examination revealed normal peripheral venous anatomy with no evidence of deep or superficial venous thrombosis (Id.).  Portable chest x-rays and a CT scan of the abdomen and pelvis performed in January of 2011, revealed no active cardiopulmonary disease (Tr. 393), no pleural effusion, normal cardiac structures and a normal gallbladder, spleen, adrenals, kidneys, stomach and pancreas (Tr. 394).

Other than extensive emergency room treatment that amounted to 77 visits over the course of approximately two years, Hartman began treatment for his mental health complaints at the Phoenix Health Center in mid-2011 (Tr. 525-539, 817-835).  He was first treated on June 6, 2011, for complaints of pain related to burns he received when a home stove exploded (Tr. 532-533).  On that occasion, he complained about anxiety, ADHD since childhood, racing thoughts and "bad disks" in his back (Tr. 532).  Examination confirmed skin lesions on the lower right leg (Tr. 533).  Hartman was given a prescription of Tramadol and

---

[20] "Facet joints are found in the posterior of the spine. There are 24 vertebrae which form the human spine. There are two facet joints between the vertebrae of each spinal segment along the spinal column."

"The facet joints and disc space form a three joint complex near each vertebra. A facet joint has two bony surfaces with cartilage between them and a capsule of ligaments surrounding it. Synovial fluid lubricates the joints as is the case with any joint....[F]acet arthropathy is degenerative arthritis affecting the facet joints in the spine."

http://www.myspinedoctors.com/diagnosis-and-treatments/facet_joints.html  (last visited May 21, 2013)

Baclofen for his back and leg pain.  He was prescribed Seroquel for anxiety and insomnia (Id.).

Medication records reveal that Hartman also was prescribed Nexium, Naproxen, Omeprazole

and Gabapentin (Tr. 535).

       After missing a followup appointment with a mental health coordinator, Hartman

returned to the Phoenix Health Center on June 27, 2011, with complaints of ADHD, memory

problems, depression and racing thoughts (Tr. 530).  On that occasion, Hartman reported that the

Seroquel was helping to slow his mind (Id.).  His mood disorder was then reported to be stable

(Tr. 531).  His sleep was described as being "OK." (Id.).

       On July 25, 2011, Hartman returned to the Phoenix Health Center for further

evaluation of his mental problems (Tr. 528-529).  At that time, he was homeless and had been

living at the St. Vincent DePaul shelter for approximately three months.  Other than treatment

for ADHD in childhood, Hartman reported no other mental health treatment history, but did

relate that he has periods of depression and times when he is "hyper."  (Tr. 528).  Hartman

reported that he was very anxious and sometimes heard "mumbling" outside his head, which he

thought might be his own thoughts (Id.).  He was diagnosed  by psychiatric nurse, Donna Ward,

APRN, with ADD, bipolar disorder and a generalized anxiety disorder along with post-traumatic

stress disorder (Id.).  Nurse Ward prescribed Strattera, Neurotin, Lithium and Seroquel to

address his mental health problems (Tr. 527).  On August 5, 2011, Hartman reported he was

"doing well" and was working on his disability claim (Tr. 525).  Although a union electrician,

Hartman reported that he could not obtain work as such, due to the cervical cage implanted in his

neck following his waterskiing accident (Tr. 525).

       On Dec. 19, 2011, Hartman returned to the Phoenix Health Center reporting that

he had been very depressed and was having problems with his memory (Tr. 823). He also reported that he had been prescribed Imitrex for migraine headaches (Tr. 823-824). Nurse Ward's assessment continued to be mood disorder (probably bipolar), migraine headaches and chronic pain (Tr. 824). Hartman's prescriptions for Lithium, Neurontin and Seroquel were changed to Depakote. He was prescribed Imitrex for his headaches and continued on his prescriptions of Baclofen and Neproxin (Tr. 824).

When Hartman reappeared two days later on Dec. 21, 2011, his speech was noted by Ward to be loud and pressured (Tr. 822-823). Hartman reported he was having trouble "controlling [his] mind" and stated that he could not [mentally] slow down (Id.). Treatment notes reflect that Hartman was difficult to work with and that he exhibited poor concentration and focus, along with inappropriately euphoric behavior (Tr. 822). Ward's diagnosis remained bipolar disorder, ADHD, PTSD and LD (Id.). Her prognosis for Hartman on that occasion was noted to be poor (Id.).

The following month on Jan. 17, 2012, Hartman again appeared at the clinic behaving in a manic fashion with pressured speech (Tr. 820-821). He was noted to be euphoric, laughing and joking. Although he insisted that he took his Depakote medication as prescribed, when nurse Ward advised Hartman that a Depakote blood level would be drawn, he responded "chi-ching ... one for the doc ... you caught me." (Id.). Hartman apparently had not taken his Depakote as prescribed. His diagnosis remained bipolar disorder (manic) and PTSD (Tr. 820). Nurse Ward continued treatment with Seroquel and Neurontin and restarted the Depakote prescription. Her prognosis for Hartman remained poor, as did her assessed GAF score of 40. (Tr. 820).

16

Hartman's last documented visit to Phoenix Health Center for his mental health condition occurred on Feb. 14, 2012 (Tr. 818-819). Once again, Hartman appeared to be manic, was talking in loud, pressured speech and laughing (Tr. 818). Although he insisted to APRN Ward that he was taking his Depakote medication, a blood-level test indicated that Hartman was not doing so (Id.). Hartman continued to complain of concentration problems. His affect was noted to be euphoric and expansive, and his mood was manic with rapid thoughts (Id.). Diagnosis remained bipolar disorder, manic, and PTSD (Id.). His prognosis was again noted to be poor with a GAF score of 45 (Id.). Hartman was continued on his current medication (Id.).

On June 25, 2012, Ward, a psychiatric nurse practitioner, prepared a medical source statement of Hartman's ability to do work-related activities (mental) (Tr. 836-837). In her medical source statement, Ward rated Hartman as being "poor," in other words with no useful ability to function, in almost every category of work-related activity (Id.). Specifically, she found that he had a poor ability to: (1) understand and remember detailed instructions; (2) carry out detailed instructions; (3) mentally maintain attention and concentration for extended periods; (4) perform activities within a schedule; (5) maintain regular attendance and be punctual; (6) sustain ordinary routine without special supervision; (7) work with others without being distracted; (8) make simple work-related decision; (9) complete a normal workday or workweek; and (10) perform at a consistent pace (Tr. 836). Ward also found Hartman had a poor ability to: (11) interact appropriately with the public; (12) accept instructions and respond appropriately to criticism from supervisors; (13) get along with co-workers and peers; (14) maintain socially appropriate behavior; (15) adhere to basic standards of neatness and cleanliness; (16) respond appropriately to changes in the workplace; and (17) set realistic goals

17

or make plans independently of others (Tr. 837).  She determined that if awarded benefits, Hartman would not be able to manage his benefits in his own best interest (Id.).

The conclusions of APRN Ward concerning Hartman's non-exertional limitations were not shared by non-examining, state agency psychologists, Laura Cutler, Ph.D., and Mary Thompson, Ph.D., who reviewed the medical records concerning Hartman's mental problems through Sept. 2011 and Jan. 2012, respectively.  Drs. Cutler and Thompson both determined that while Hartman does suffer from affective and personality disorders, his mental condition has resulted in only mild restrictions in activities of daily living and moderate restrictions in maintaining social functioning and maintaining concentration, persistence or pace.[21]  ALJ Jacobs accorded the determination of these two non-examining, state agency psychologists more weight in his hearing determination than the conclusions of APRN Ward.  The ALJ did so based on the remainder of Hartman's medical treatment records, which showed no prior treatment history for mental illness, nor any recorded observations by medical personnel of the type of manic behaviors noted by psychiatric nurse Ward (Tr. 28-29).

Vocational Expert Robert Piper also testified at the hearing (Tr. 65-71). After discussing the exertional and skill levels of Hartman's past relevant work as a cashier, a hand packager and a protective signal repair person, Piper addressed the hypothetical question presented by ALJ Jacobs (Tr. 66).   The hypothetical included the exertional and nonexertional limitations set forth in finding of fact no. 5 of the ALJ's hearing decision (Tr. 25, 66-67).  With these limitations, and given Hartman's age, education, and work history, Piper testified that Hartman would remain capable of performing light exertional,  alternative work in jobs such as

---

[21](Tr. 120, 123-124, 135-136, 148-149).

18

sorter, inspector/packer, and office helper (Tr. 67-68).  At the sedentary exertional level, Hartman would remain capable of performing alternative work as a office clerk, addresser or packager. (Tr. 68-69).  On cross-examination, however, Piper conceded that if Hartman's various health conditions required him to miss as much as 77 days over 19 months, such excessive absenteeism would preclude all substantial gainful activity. (Tr. 69-70).  Piper similarly concluded that if Hartman was required to take a break every time he changed position, every 30 or 40 minutes, such a requirement also would eliminate all of the jobs identified. (Tr. 71).

## LEGAL ANALYSIS

### Finding of Fact No. 3.

In this finding, ALJ Jacobs determined that Hartman has severe impairments of lumbar degenerative disk disease with radiculopathy, cervical degenerative disk disease with radiculopathy, and bipolar/anxiety/ADD/PTSD (Tr. 23).   ALJ Jacobs otherwise found that Hartman's remaining conditions of record "appear no more than brief or transient in nature and not otherwise consistent with the conditions that the claimant now alleges as disabling" (Id.). Among these other conditions, ALJ Jacobs included Hartman's history of thoracic outlet compression, bone infection and multiple fractures of the right leg (Id.).  ALJ Jacobs noted that Hartman had sought little or no consistent treatment for these conditions, and that repeated diagnostic imaging of Hartman's lower right leg, knee and ankle had revealed only well-healed prior injuries and were otherwise negative for any acute injury (Tr. 23, 722-728).

Hartman now argues that ALJ Jacobs failed to address the discrepancy between

19

the shortened length of his previously-injured right leg and his left leg (DN 12, p. 3-4). He also

contends that ALJ Jacobs failed to address his severe headaches, as well (Id.). Hartman

maintains that both his headaches and the discrepancy in the length of his legs are severe

impairments that should have been included among the other severe impairments identified by

ALJ Jacobs.

Hartman notes in his fact and law summary that he testified during the July 2012

administrative hearing about his prior history of headaches, as well as his treatment with the

Imitrex for these headaches (Tr. 61-63). During the hearing, Hartman testified that his head

"hurts all the time" and that when his headaches "get real bad," such as when he feels a migraine

headache coming on, he will take Imitrex (Tr. 62). Hartman estimated that he experiences such

headaches two or three times a month, and that his headaches last anywhere from 6-16 hours (Tr.

63). Hartman correctly notes that his medical records reflect both headache complaints and

prescriptions for Imitrex to treat them (Tr. 603-604, 655, 823, 835).

Hartman also points to various portions of the administrative record that confirm

the difference in length between his shorter right and longer left legs. Hartman testified during

the hearing that he suffered a severe injury-- multiple compound fractures-- to his lower right leg

following a 1976 motorcycle accident that left his right leg shorter than the left one (Tr. 61). The

same accident also resulted in the severe injury of his right foot, which Hartman described as

being "crushed" and "deformed," resulting in "a lot of problems with walking and pain."[22] (Tr.

---

[22] Prior diagnostic imaging of the right ankle performed on Nov. 8, 2010, confirms a
deformity of the distal shaft of the fibula, along with an old healed fracture that showed moderate
lateral displacement along with boney thickening consistent with an older fracture of the tibia
(Tr. 724-725, 727-728).

61).  The impact of this leg-length discrepancy, according to Hartman, is difficulty ambulating

and a noticeable limp, a limp that various employees of the Social Security Administration

(SSA) noted when Hartman appeared at their offices to apply for benefits (Tr. 235).[23]  The leg-

length discrepancy and Hartman's antalgic gait also are noted in earlier medical records, as well

(Tr. 352, 544).[24]

       The question now is whether ALJ Jacobs erred to Hartman's substantial prejudice

by his refusal to include these additional impairments among the severe impairments set forth in

finding of fact no. 3 of the hearing decision.  At step 2 of the sequential evaluation process, the

Commissioner determines which impairments presented by a claimant are severe.  See 20 C.F.R.

§§404.1520(a)(4)(ii), 416.920(a)(4)(ii).  This second step of the disability analysis, as noted, is a

*di minimus* hurdle.  *Higgs*, 880 F.2d at 862, which is designed merely to screen out totally

groundless claims.  *Farris v. Sec'y of HHS*, 773 F.2d 85, 89 (6th Cir. 1985).

       If the Commissioner does fail to include among the severe impairments identified

a particular impairment that is not "*di minimus*" this oversight ordinarily will not constitute

reversible error if the ALJ finds that the claimant has at least one severe impairment, and then

---

[23]  The Social Security representative on Nov. 14, 2011, included in the observations
section of her field office disability report, Form SSA 3367, that Hartman "had limped when
walking."  (Tr. 235).

[24]  ALJ Donald Campbell in his prior 2001 hearing decision directly discusses the history
of Hartman's 1976 motorcycle accident in which he sustained multiple fractures of his right leg
(Tr. 93).  In this discussion, ALJ Campbell summarized the treatment notes of Dr. David
Thurman, a physical medicine and rehabilitation specialist, who noted that Hartman had fair
strength in the affected area of the leg and grossly normal strength in the lower right extremity
with normal sensory evaluation and reflexes in his right leg (Id.).  Further, Dr. Thurman, as
summarized by ALJ Campbell, noted that Hartman's "right leg measured slightly smaller than
the left from the medial epicondyle to the tip of the medial malleolus."  (Id.).

continues in the hearing decision to evaluate both the claimant's severe and non-severe impairments at the remaining steps of the evaluation process.  *See Maziarz v. Sec'y of HHS*, 837 F.2d 240, 244 (6th Cir. 1987); *Anthony v. Astrue*, 266 Fed.Appx. 451, 457 (6th Cir. 2008) ("The fact that some of [a plaintiff's] impairments were not determined to be severe at step 2 is therefore legally irrelevant" once step 2 is "cleared" and the ALJ considers the plaintiff's severe or non-severe impairments in the remaining steps of the analysis.").

It appears to the Court that is exactly what has happened here - -  the ALJ did err, at least to the extent that he failed to include Hartman's headaches and his medically documented leg-length discrepancy among the severe impairments identified in finding of fact no. 3.  This error, however, is legally irrelevant in the Court's view since ALJ Jacobs immediately continued to take into account the resulting limitations of these two impairments in his application of the remaining steps of the 5-step sequential evaluation process (Tr. 24-31).

For example, ALJ Jacobs at step 4 of the evaluation process specifically made mention of Hartman's difficulty in walking when he considered Hartman's residual functional capacity at finding of fact no. 5 of his hearing decision (Tr. 26).  ALJ Jacobs considered Hartman's stated limitations with walking and standing in his RFC determination (Tr. 26, 47-49).  He also directly referred to Hartman's testimony about his headaches and blurred vision (Tr. 26, 62-63).  ALJ Jacobs, however, chose to reject the credibility of Hartman's testimony concerning the extent of his resulting limitations.  In particular, the ALJ rejected Hartman's testimony concerning his limitations regarding his ability to stand based on certain medical notes indicating that Hartman had been standing for approximately four hours on a ladder while working the day prior to receiving treatment (Tr. 27, 677), along with medical records with

repeated references to extensive walking (Tr. 27, 644, 663).

Beyond the ALJ's reference to these two conditions– headaches and leg discrepancy-- in his discussion at finding of fact no. 5 (Tr. 25-29), he also included in this same RFC finding certain limitations related to both of these impairments.  For example, ALJ Jacobs specifically limited Hartman from working around "bright pulsating lights (due to headaches alleged at hearing)...."  (Tr. 25).  He likewise limited Hartman to sedentary work with use of a cane to ambulate, a 30-minute sit/stand option and no pushing/pulling with the lower extremities (Tr. 25).  Such exertional and nonexertional limitations indicate to the Court that ALJ Jacobs properly considered the impact of Hartman's headaches and his problems related to his leg-length discrepancy when considering Hartman's RFC.  Accordingly, the alleged failure of ALJ Jacobs to include Hartman's headaches and leg-length discrepancy among the severe impairments identified in finding of fact no. 3, even if assumed to be error, was at worst harmless error that did not substantively prejudice Hartman.  *Maziarz*, 837 F.2d at 244.

**Finding of Fact No. 5.**

Hartman turns next in his fact and law summary to finding no. 5 of ALJ Jacobs' hearing decision (Tr. 25-29).  In this finding, ALJ Jacobs determined that Hartman retains the residual functional capacity to perform light and sedentary work with various limitations including a sit/stand option, use of a cane, avoidance of hazards such as vibration or bright lights, no overhead reaching, pushing/pulling with the lower extremities and no kneeling, crawling or climbing ladders/ropes/scaffolds (Tr. 25).  ALJ Jacobs also limited Hartman in finding no. 5 to simple repetitive tasks with no production rate pace work and only occasional

contact with co-workers/supervisors, and no contact with the public (Id.).  *See* 2 C.F.R.

§§404.1567(a)(b) and 469.967(a)(b).  In reaching this RFC determination, ALJ Jacobs found that

Hartman's medically determinable impairments could reasonably be expected to cause some of

his alleged symptoms, but that his statements concerning the intensity, persistence and limiting

effects of those symptoms were not credible to the extent they were inconsistent with the ALJ's

RFC assessment (Tr. 26).

Hartman now raises a substantial number of arguments in his challenge to finding

of fact no. 5 (DN 12, pp. 4-15).  Initially, he argues that the finding is not supported by

substantial evidence due to the failure of ALJ Jacobs to take into consideration the prior

determination of ALJ Campbell, who in his 2001 hearing decision found Hartman unable to

make constant repetitive use of his hands (Id. at 4).  Hartman points out that ALJ Campbell in his

prior decision not only limited him to light and sedentary work, but also limited him with "no

constant, repetitive use of the hands."  (Tr. 101).  Hartman contends that application of the

collateral estoppel doctrine required that ALJ Jacobs cite substantial evidence of medical

improvement before he removed this particular limitation of constant, repetitive hand use (DN

12, p. 2).  ALJ Jacobs, according to Hartman, removed the limiting factor, the "constant"

repetitive use, without making the necessary finding of improvement to satisfy the collateral

estoppel doctrine.  *See Drummond v. Comm'r*, 126 F.3d 837, 840-843 (6th Cir. 1997).

Under *Drummond*, collateral estoppel will apply "to preclude reconsideration by a

subsequent ALJ of factual findings that have already been decided by a prior ALJ when there are

no changed circumstances requiring review.  *Blackburn v. Comm'r*, Case No. 4:11-CV-58, 2012

WL 6764068 at *5 (E.D. Tenn., Nov. 14, 2012) (quoting *Brewster v. Barnhart*, 145 Fed. Appx.

24

542, 546 (6th Cir. 2005)).   Thus, for example, a plaintiff who hopes to  avoid application of the collateral estoppel doctrine based on a prior unfavorable factual determination by the Commissioner must prove that more severe limitations developed from his or her previously determined impairments by presenting new and material evidence of a deterioration in his or her condition since the prior ALJ hearing. *See Slick v. Comm'r*, Case No. 07-13521, 2009 WL 136890 at *4-5 (E.D. Mich. Jan. 16, 2009).   *See* Acquiescence Ruling 98-4(6) (The agency "must adopt [the residual functional capacity finding] from a final decision by an ALJ or the Appeals Council on the prior claim in determining whether the claimant is disabled with respect to the unadjudicated period unless there is new and material evidence relating to such a finding....").

Here, ALJ Jacobs directly referred to the prior 2001 hearing decision of ALJ Campbell at pp. 7-8 of his hearing decision (Tr. 26-27).   He noted that based on his review of the record, the recent medical evidence supported both different and to some degree, greater limitations (Tr. 26).   ALJ Jacobs then continued to refer to the disability function report in which Hartman alleged difficulty in "using [his] hands."  (Tr. 26, 254, 256).   ALJ Jacobs concluded upon review of the current medical records, however, that no objective medical evidence or treatment history supported Hartman's complaints about using his hands.   To quote ALJ Jacobs, "He has alleged difficulty hearing, using his hands and side effects from medication, which are not corroborated by any testing or physical examiner, nor do his treatment notes corroborate consistent complaints to [sic] for treatment purposes."  (Tr. 26-27).   Consequently, ALJ Jacobs found this aspect of Hartman's complaints to be not credible and not to result in "significant limitations affecting his ability to work."  (Tr. 26-27).

Examination of the administrative record fully confirms ALJ Jacobs' hearing decision in this respect. Nowhere in the many emergency room visit records of 2010-2011 does Hartman complain at all of any difficulties with the use of his hands. Most, if not all of his medical treatment, other than treatment for pancreatitis and mental problems, is limited to back, neck and leg-related pain. Nowhere do these records refer to difficulties with fine manipulation, nor does Hartman in his fact and law summary draw the Court's attention to any specific medical record that would indicate a contrary finding on this particular issue. If Hartman had experienced any significant, ongoing difficulty in using his hands, it is difficult to imagine that he would not have sought treatment after his alleged onset date of Jan. 1, 2008.[25] Accordingly, we cannot discern any violation of *Drummond*, Acquiescence Ruling 98-4(6), or the collateral estoppel doctrine arising from this portion of the hearing decision.

Hartman next challenges the credibility determination of ALJ Jacobs (DN 12, pp. 5-9). Hartman maintains that ALJ Jacobs in his hearing decision focused only on one or two isolated incidents of physical activity in 2010 and May of 2011, to conclude inappropriately that Hartman's testimony is incredible to the extent that he testified he is unable to perform substantial gainful activity (DN 12, p. 5). Hartman argues that even if these relatively few

---

[25] Review of Hartman's hearing testimony also supports ALJ Jacobs' finding in this regard. Hartman testified during the hearing that he is able to button buttons and zip zippers (Tr. 56-57). After he discussed his back, neck and leg problems at length (Tr. 46-50), the ALJ asked Hartman is he had any other physical problems (Tr. 50). Hartman responded, "No, nope." (Tr. 50).

It therefore appears that even Hartman did not believe at the time of the hearing that repetitive use of his hands presented him with any significant problems. Although he did mention being drowsy as a side effect of his medication Seroquel, Hartman added that he takes Seroquel at night (Tr. 51). Nothing in the record indicates that Seroquel affects his ability to make repetitive use of his hands during the daytime.

instances do reflect on his ability to perform SGA, the open issue remains as to the establishment of an onset date since ALJ Jacobs did not rule out the existence of a severe impairment of a duration less than 12 months beginning in May of 2011 (see 20 C.F.R. §404.1505(a)).

Additionally, Hartman maintains that ALJ Jacobs created a new definition of the term "noncompliance" when ALJ Jacobs commented at p. 8 of his hearing decision (Tr. 27) that, with regard to Hartman's back and neck impairments, his treatment after the alleged onset date "consists almost entirely of ER visits rather than ongoing visits with a specialist such as an orthopedist or a pain management doctor." (Id.). ALJ Jacobs then noted that while Hartman may have been unable to afford appropriate care, he nonetheless was provided on several occasions with lists of various income-based medical care providers, but "remained non-compliant with repeated referrals for such outpatient treatment for much of the period at issue." (Tr. 27).

On this issue, Hartman points out that ALJ Jacobs failed to explain how the medical findings contained in Hartman's many emergency room treatment records are somehow less accurate than the medical records of an "income-based provider." (DN 12, p. 6). What is important in Hartman's view is that his well-documented history of 77 emergency room visits during the two years immediately prior to the hearing confirms that his neck, back and leg conditions worsened over time and that they "resulted in additional missed work or limitations that would prevent work." (Id.).

The arguments stated above run to the credibility determination made by ALJ Jacobs in finding of fact no. 5, where he determined that Hartman retained the residual functional capacity to perform a restricted range of light and sedentary work, and that Hartman's subjective

27

complaints of pain were not credible to the extent that they exceeded this RFC determination (Tr. 25-29).   An administrative law judge properly may consider the credibility of a claimant when evaluating the claimant's subjective complaints, and the federal courts will accord "great deference to that credibility determination."  *Warner v. Comm'r*, 375 F.3d 387, 392 (6th Cir. 2004).

       The standard in the Sixth Circuit for evaluating subjective complaints, such as complaints of pain for example, was established in *Duncan v. Sec'y of H&HS*, 801 F.2d 847, 853 (6th Cir. 1986).  *See Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001) (setting forth the *Duncan* standard).

       Under *Duncan*, the Court first determines whether objective medical evidence of an underlying medical condition is present in the record.  *Id.*  If so, then the Court will examine whether such evidence confirms the severity of the claimant's subjective symptoms related to the condition, or whether the objectively established medical condition itself is of sufficient severity that it can be reasonably expected to produce the alleged subjective symptoms, such as disabling pain.  *Id.*  The findings of the ALJ in this regard are repeatedly held in the Sixth Circuit to be accorded great weight and deference given the ability of the ALJ to observe the demeanor and credibility of the witnesses.  *Walters v. Comm'r*, 127 F.2d 525, 531 (6th Cir. 1997) (citing *Villarreal v. Sec'y*, 818 F.2d 461, 463 (6th Cir. 1987)).  Yet, the ALJ is not accorded absolute deference and his or her assessment of a claimant's credibility must be supported by substantial evidence.  *Beavers v. Sec'y*, 577 F.2d 383, 386-87 (6th Cir. 1978).

       When the ALJ "finds contradictions among the medical reports, claimant's testimony and other evidence," the ALJ may properly discount the credibility of the claimant.

*Winning v. Comm'r*, 661 F. Supp.2d 807, 822 (N.D. Ohio 2009) (citing *Walters*, 127 F.3d 525,

531 (6th Cir. 1997)).  The ALJ, however, is not permitted to render a credibility determination

based solely upon a hunch, or "intangible or intuitive notion about an individual's credibility."

*Id*. (citing *Rogers*, 486 F.3d at 247) (citing SSR 96-7p)).  Under SSR 96-7p, the ALJ must in the

hearing decision set forth specific reasons for the credibility determination sufficient to make

clear to the claimant and subsequent reviewers the weight that the ALJ gave to the claimant's

statements and the reasons for such weight.  *Winning*, 661 F. Supp.2d at 823.  A mere blanket

assertion that a claimant is not believable will not be sufficient under SSR 96-7p.  *Id*. (citing

*Rogers*, 486 F.3d at 248).

   An assessment of the claimant's credibility must be based on a consideration of

all the evidence of record.  It should include consideration of not only the objective medical

evidence but the following factors as well: (1) the daily activities of the claimant; (2) the

location, duration, frequency, and intensity of the claimant's symptoms including pain; (3) any

factors that precipitate or aggravate the symptoms; (4) the dosage, type, effectiveness and side

effects of any medication taken to alleviate such symptoms or pain; (5) treatment that the

claimant has received for relief of his or her symptoms; (6) any measures other than treatment

that the claimant uses to relieve his or her symptoms; and (7) any other factors relating to the

functional limitations and restrictions of the claimant due to such symptoms or pain.  *Id*. at 823

n. 14 (citing SSR 96-7p)  Also included among the evidence that the ALJ must consider are the

medical signs and laboratory findings of record, the diagnosis, prognosis and medical opinions

provided by any treating physicians or other medical sources, and any statements or reports from

the claimant, physicians or other persons about the claimant's medical history, treatment,

response to treatment, prior work record, daily activities and other information related to the symptoms of the claimant and how such symptoms affect his or her ability to work.  *Id*.

When the record establishes consistency between the subjective complaints of the claimant and the other evidence of record, such consistency will tend to support the credibility of claimant, while in contrast, any inconsistency in this regard will tend to have the opposite effect. *Winning*, 661 F. Supp.2d at 823.  The reviewing court does not make its own credibility determinations.  *Franson v. Comm'r*, 556 F. Supp.2d 716, 726-27 (W.D. Mich. 2008) (citing *Walters*, 127 F.3d at 528)).  The federal courts will not substitute their own credibility determination for that of the ALJ as the fundamental task of the Commissioner is to "resolve conflicts in the evidence and to decide questions of credibility."  *Rineholt v. Astrue*, 617 F. Supp.2d 733, 742 (E.D. Tenn. 2009) (citing *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994)).  Given the substantial deference accorded the credibility determination of the Commissioner, "'claimants challenging the ALJ's credibility determination face an uphill battle.'"  *Franson*, 556 F. Supp.2d at 726-27 (citing *Daniels v. Comm'r*, 152 Fed. Appx. 485, 488 (6th Cir. 2005)).

Examination of the various treatment records for Hartman's physical and mental impairments fully supports the credibility findings of ALJ Jacobs.  Various emergency room treatment records on multiple occasions reflect exertional, employment-related activity well in excess of the limitations professed by the claimant.  On April 30, 2010, Hartman appeared at the U of L emergency department with complaints of lower back pain (Tr. 740).  He reported on that occasion that he had been doing work as a lawn care worker and had been lifting his brother to transfer him from the bed to the bathroom (Id.).  Several months later in mid-June of 2010,

30

Hartman returned to the emergency room at U of L after falling while riding an all-terrain

vehicle (Tr. 734).  Later that year in August , he was wrestling with his son when he twisted his

neck (Tr. 729).  In November of 2010, he returned after he slipped and fell from a roof resulting

in an increase in his back pain (Tr. 718).

Hartman reappeared at the U of L emergency room in late May of 2011, with

complaints of pain in the lower right extremity "since [he] started back to work this week."  (Tr.

671).  The following month in June he returned with a prescription refill request at which time he

reported that he had "a lot of walking to do...."  (Tr. 663, 644).  By November 1, 2011, Hartman

during another visit to the U of L emergency room, reported that he was moving to Indiana "for a

job at a church for electrical wiring up past Huber's."  (Tr. 609).

On a separate visit to Jewish Hospital in mid-November of 2011, Hartman

appeared with complaints of neck pain after he was "'put on a job' where he was turning his

neck repeatedly for 8 hours."  (Tr. 564).  Similarly, emergency room records from the Norton

Hospital dated Dec. 12, 2010, reflect that Hartman "works as an electrician and does a lot of

bending and lifting at work." (Tr. 351).  Other Norton emergency room records from the

following year in January of 2011, indicate that Hartman, who was seeking treatment for chest

pain, reported that he performed "heavy activity yesterday."  (Tr. 387).  Thus, the medical record

cited above reflects more than mere isolated incidents as Hartman claims.  Rather, these

treatment record notations document repeated and ongoing physical activities well beyond the

physical limitations professed by Hartman during his hearing testimony.

Further, repeated references to the performance of work well after the alleged

onset date, while not proof of substantial gainful activity itself, directly contradict Hartman's

31

hearing testimony.  During the hearing, ALJ Jacobs asked Hartman if he had worked at all since

Jan. 1, 2008 (Tr. 45).  Hartman responded falsely that he had worked only a single day for a

temporary service, but he was unable to do the work he was assigned due to problems with his

neck and leg (Tr. 46).  In fact, well after January of 2008, Hartman by his own statements to

various medical service providers indicated that he had worked in lawn care service, as an

electrician and possibly as a roofer, as well.  ALJ Jacobs therefore was fully entitled to point to

these material inconsistencies in evaluating Hartmans' credibility.  Such inconsistencies support

ALJ Jacobs' conclusion that Hartman's statements concerning the intensity, persistence and

limiting effects of his low back, neck and leg pain were not credible to the extent that they

exceeded a residual functional capacity for a limited range of sedentary and light work (Tr. 26).

Hartman also faults ALJ Jacobs for taking into consideration when evaluating

Hartman's credibility his apparent unwillingness to seek ongoing medical treatment for his

reoccurring back, neck and leg problems at any of the various income-based medical service

providers recommended by his treating emergency room care providers (DN 12, pp. 5-6).  On

various occasions when Hartman appeared at the U of L emergency room, he was provided with

a lengthy list of indigent family health centers that provide outpatient treatment for a reduced fee

contingent upon the patient's limited income.[26]  Hartman was provided with this information so

that he could obtain followup treatment for his various conditions with a primary care physician,

rather than ad hoc treatment on an as-needed basis at the emergency room.

Hartman did not seek ongoing treatment with a primary care physician at any of

the local family care centers recommended by the U of L emergency room doctors.  ALJ Jacobs

---

[26]   (Tr. 27, 635, 699, 714, 733).

was fully entitled to take into account the nature and extent of the medical treatment sought, or not sought, by Hartman in evaluating the issue of his credibility. *See Ealy v Comm'r,* 172 Fed. Appx. 88, 90 (6th cir. 2006)(ALJ properly considered the lack of more aggressive medical treatment along with the claimant's activities in making his credibility determination). *See gen. Hale v. Sec'y HHS,* 816 F.2d 1078, 1082 (6th Cir. 1987).

Further, it does not appear that this particular aspect of Hartman's medical history was pivotal in the outcome of his disability claim. While the use of the term "noncompliant" is perhaps subject to debate, the unalterable fact remains that Hartman never sought regular, ongoing follow-up treatment from a primary care physician at an income-based family health center, but instead sought only ad hoc, or as-needed, emergency room treatment. The ALJ's consideration of this circumstance was not error under the above-cited case law relating to credibility.

Hartman also insists that ALJ Jacobs engaged in an *ad hominem* attack on him (DN 12, p. 7-8). Specifically, Hartman points to the previously discussed portions of the emergency room treatment records that repeatedly indicate Hartman, following his alleged onset date, was engaged in various exertional activities inconsistent with his professed limitations. Hartman claims that all that these repeated incidents established is that he was physically incapable of sustained work as an electrician, landscaper and possibly roofer. Hartman dismisses these incidents as being irrelevant. He also characterizes as an *ad hominem* attack ALJ Jacobs' reference to the numerous diagnostic studies (x-rays, CTs, EKGs), which the ALJ found to be either negative or inconsistent with Hartman's allegations of disabling symptoms (DN 27).

The Court has carefully examined this portion of the ALJ's decision, along with

33

the medical record referred to in the decision.  The Court finds nothing pejorative in the ALJ's

discussion of Hartman's extensive history of diagnostic imaging.  Hartman did undergo

significant diagnostic imaging as part of his treatment at the U of L emergency room.  Various x-

ray, MRI and CT scan studies were performed on different occasions.[27] As ALJ Jacobs noted, the

majority of these imaging studies revealed only minor, or at most, moderate degenerative

changes in the affected area of the body, test results inconsistent with Hartman's testimony

concerning the extent of his limitations.

      As earlier noted, imaging studies of the shoulder and elbow performed in

February of 2010, revealed normal joint spaces and soft tissue, normal ribs and left lung (Tr.

747-748).  A CT scan of the cervical spine without contrast performed on June 17, 2010,

confirmed the presence of Hartman's intravertebral cage fusion of the C5-C7, but no evidence of

hardware loosening or infection.  The cervical vertetral bodies otherwise demonstrated a normal

alignment (Tr. 736-737).  A CT scan of the cervical spine two months later revealed no

significant changes (Tr. 731).  All that was revealed on that occasion were bone spurs of the C5-

C6 with narrowing of the disk space and "mild" narrowing of the C4-C5 disk space with the

spurs at C5-C6 intruding "slightly" into the anterior margin of the spinal canal.  (Id.).

      Imaging of the right tibia and fibula in mid-November of 2010, revealed only

mild generalized osteopenia related to diminished use with no acute abnormalities (Tr. 728).

Imaging of the right foot on the same date confirmed deformity due to a prior trauma, but

otherwise only generalized osteopenia and a subacute fracture of the great toe (Tr. 727).

Imaging of the lumbar spine on that occasion, as earlier noted, revealed a lumbarized S1 with

---

[27]  (Tr. 393-395, 463, 523, 707, 709, 721-728, 731, 736, 747-749).

some narrowing of the disk space between the L1 and the L2, but the "other lumbar disks appear normal," Only some narrowing of the disks between the T11 and T12 was otherwise noted (Tr. 726). No vertebral body compressions were seen and the sacroiliac joints appeared within normal limits with only "very mild dextroscoliosis observed at the L3 (Id.).

Views of the right ankle obtained on the same date revealed only an old healed fracture with no new acute fracture or dislocation and only "a few small spurs in the mid-tarsal region with some compression deformity of the navicular bone, not acute." (Tr. 724). Similarly, images of the thoracic spine on that occasion showed only "slight chronic anterior wedging of the body at the T11" with no mal-alignment. (Tr. 723). All perispinal soft tissues were noted to be normal (Id.). Pelvic diagnostic imaging likewise revealed no acute abnormalities, foreign bodies or soft tissue calcification (Tr. 722).

CT scan imaging of the abdomen related to complaints of pancreatitis was performed in January of 2011 (Tr. 707-708). Imaging studies revealed no acute abnormality in the abdomen or evidence of complications from pancreatitis (Tr. 708). Only several subcentimeter low attenuation lesions were visualized in the liver, along with a small hiatal hernia (Id.). The lung bases were noted to be clear. The liver, spleen, pancreas, kidneys and adrenal glands, as well as the gallbladder, also were noted to be within normal limits (Tr. 707). An MRI of the lumbar spine in July of 2011, confirmed the earlier-mentioned lumbarized S1 vertebrae, but otherwise revealed only "some mild multilevel degenerative changes mostly consisting of degenerative disk disease at the L1-L2, L2-L3 and L5-S1 with no significant neural foraminal or spinal canal narrowing demonstrated." (Tr. 524).

The above-discussed imaging test results were fairly characterized by the ALJ as

35

being either negative or inconsistent with the extent of the limitations and subjective complaints expressed by Hartman in his hearing testimony.  ALJ Jacobs accordingly properly considered these same test results in assessing the extent of Hartman's subjective complaints along with the other factors identified in 20 C.F.R. §404.1529(c)(3) and SSR 96-7p.  His discussion reveals no meaningful bias or other prejudice against Hartman based on Hartman's treatment history. An adverse ruling is not sufficient of itself to support a finding of bias. *Perschka v. Comm'r,* 411 Fed. Appx. 781, 788 (E.D. Ky. 2010)(citing *First Nat'l Monetary Corp v. Weinberger,* 809 F.2d 1334, 1337 (6th Cir. 1987)).

Hartman also raises several issues involving the findings of ALJ Jacobs concerning his mental impairments (DN 12, pp. 9-12).  ALJ Jacobs at pages 9-10 of his hearing decision characterizes Harman's mental health treatment as being "wholly conservative and sporadic at best...."  (Tr. 28).  ALJ Jacobs notes that Hartman only sought such mental health treatment for a brief period of time beginning in June of 2011, more than three years after the alleged onset date of Hartman's disability in January of 2008 (Id.).  ALJ Jacobs further observed that the manic behaviors noted by APRN Donna Ward on various occasions at the Phoenix Health Center (Tr. 525-539, 817-835) were inconsistent with the direct observations of various emergency room medical personnel, who routinely indicated in their own treatment notes that Hartman exhibited an appropriate mood/affect, was fully oriented and in no acute mental distress.[28]

ALJ Jacobs found these emergency room treatment notes to be more consistent

---

[28] (Tr. 655, 663, 665, 667, 671, 673, 677, 682, 685, 686, 690, 692, 702, 719, 730, 732, 734, 739, 740, 743, 744, 751).

with the medical records as a whole than the notes of APRN Ward, which ALJ Jacobs found failed to establish a period of disability approaching 12-months, even if Hartman's severe mental symptoms, as related by APRN Ward, were considered to be accurate and fully credible (Tr. 28). ALJ Jacobs, however, gave little weight to the medical source statement of ability to do work-related activities (mental) prepared by APRN Ward on June 25, 2012 (Tr. 836-37).  Ward, as noted, concluded in her medical source statement that Hartman had no useful ability to function in almost every work-related category evaluated, except for having a fair ability to understand and carry out short simple instructions and to remember work-like procedures (Tr. 836).

ALJ Jacobs chose to assign more weight to the state agency reviewing psychologists, Laura Cutler, Ph.D., and Mary Thompson, Ph.D., who reviewed the evidence of record concerning Hartman's mental condition in September of 2011, and January of 2012, respectively.[29]  Both Cutler and Thompson concluded that Hartman exhibited no more than moderate restrictions in his ability to maintain concentration, persistence or pace and to function socially (Tr. 136, 149).  ALJ Jacobs gave the opinion of these two state agency psychologists great weight, and concluded, similar to ALJ Campbell in his 2001 decision, that Hartman retained the residual functional capacity to perform simple, repetitive, low stress work with no close interaction with the public.

Hartman now claims that ALJ Jacobs applied an inappropriate standard in evaluating Hartman's nonexertional impairments.  According to Hartman, the paucity of treatment cannot be a valid reason to disbelieve Hartman's credibility.  Hartman argues that the treatment notes of APRN Ward from the Phoenix Health Center readily confirm his chronic

---

[29]  (Tr. 106-108, 111-119, 120, 124, 135-136, 148-149).

insomnia, his racing thoughts, his manic behaviors, his anxiety and ADD (DN 12, p. 10).  These

behaviors resulted in his current diagnosis of bipolar disorder, learning disability, general

anxiety and PTSD (Tr. 528-531).  Further, Nurse Ward in her assessment found him to be

clinically unstable, exhibiting manic behavior with pressured speech and rapid thoughts (Tr. 118-

122).

   Hartman argues that the ALJ improperly disregarded the material findings of

Nurse Ward, findings which are consistent with severe, ongoing mental impairments, in favor of

the remote and nonspecific findings of two non-examining individuals who did not provide

mental health treatment for Hartman's acknowledged psychiatric problems.  Hartman insists that

this approach does not comport with *Blankenship v. Bowen*, 874 F.2d 1116, 1124 (6th Cir. 1989).

Hartman also insists that, as a mentally impaired individual, he should not be faulted for failing

to seek treatment earlier or more regularly as the symptoms of his mental illness naturally

precluded him from doing so.  Conditions such as his, according to Hartman, do not have an

immediate onset date, but rather evolve gradually over time.  Accordingly, one may naturally

conclude that Hartman's various severe mental impairments did not simply manifest themselves

on the first day he visited  Nurse Ward, but rather have been ongoing for a substantial period of

time dating all the way back to his childhood, when he first manifested symptoms of ADHD and

anxiety (DN 12, pp. 11-12).

   As for the observations of any Social Security personnel during face-to-face

interviews, Hartman insists that such observations have no value in the face of psychiatric nurse

Ward's treatment notes that confirm the existence of unstable bipolar disorder, ADHD, anxiety

disorder and PTSD.  Hartman adds that the observations of a disability examiner, such as

Shannon McRoberts, may not be cited as a basis on which to deny benefits (DN 12, p. 13) (citing *Jones v. Astrue*, 808 F. Supp. 2d 993, 998-99 (E.D. Ky. 2011)).  Finally, Hartman challenges the statement of the ALJ that his hearing decision is based on the evaluation of a reviewing psychologist, a statement which Hartman claims has no basis in the record, since it contains "no form signed by state agency doctors or psychologists...."  (DN 12, p. 13).

The Court concludes upon consideration of these arguments that substantial evidence supports the determination of the ALJ with regard to the findings found at pp. 9-10 of the hearing decision concerning Hartman's mental impairments.  ALJ Jacobs did not run afoul of *Blankenship v. Bowen*, 874 F.2d at 1116, in his reliance on the highly limited nature of Hartman's mental health treatment at the Phoenix Health Center, treatment which did not begin until early June of 2011, more than three years after his alleged onset date, through February of 2012 (Tr. 525-539, 817-835).

Unlike the present case, *Blankenship* involved a claimant afflicted with a progressive mental illness, schizoid personality, "a personality disorder similar to that of schizophrenia only milder."  *Blankenship*, 874 F.2d at 1119 n.4.  Mental examination of Blankenship revealed him to be expressionless, bewildered with slowed speech and difficulty comprehending anything but the simplest words, with impaired memory, clouded sensorium that indicated a severely deteriorated mental status, which the ALJ concluded had slowly progressed in intensity since 1979, until the final psychiatric exam in November of 1985.  *Id*. at 1119-1120.  In *Blankenship*, the Secretary [now Commissioner] concluded that Blankenship was not disabled until November 13, 1985, a finding that the Sixth Circuit held to be contrary to SSR 83-20, with its cautionary language concerning slowly progressive impairments which sometimes make it

39

impossible to obtain medical evidence establishing a precise onset date, thereby requiring the decision maker to infer the onset date "from the medical evidence and other evidence that describe the history and symptomology of the disease process."  Id. at 1122 (quoting SSR 83-20).

Here, we do not have the situation in *Blankenship*.  Hartman has not been diagnosed with a progressive, degenerative psychological condition such as a schizophreniform mental disorder.  He does not have an extended history of mental treatment such as the claimant in *Blankenship* exhibited.  Indeed, prior to his arrival at the Phoenix Health Center in early June of 2011, Hartman apparently had no documented substantial history of mental health treatment other than scarce references to ADHD and anxiety issues in childhood (Tr. 670).  Further, ALJ Jacobs properly considered this absence of treatment history in his determination that Hartman's mental impairments are not of a disabling severity.

While it indeed may be "questionable practice to chastise one with a mental impairment for exercise of poor judgment in seeking rehabilitation," *Blankenship*, 874 F.2d 1124, Hartman gave no indication in his 77 emergency room visits that he was disinclined, or otherwise unable or inhibited, to seek medical treatment for any of his medical needs.  Quite the contrary,  Hartman regularly appeared in the emergency room of the U of L Hospital in 2010 and 2011, where medical personnel routinely noted him to be fully oriented with a normal, or otherwise unremarkable, mood and affect.  Given the complete absence of any prior mental health treatment history, other than the brief period at the Phoenix Health Center noted above, and the absence of any outward manifestation of manic symptoms outside the confines of the Phoenix Health Center, ALJ Jacobs cannot be persuasively criticized based on *Blankenship*.  *See*

40

*McClanahan v. Comm'r*, 474 F.3d 830, 840 (6th Cir. 2006); *Abney v. Astrue*, Case No. 5:07-394-KKC, 2008 WL 2074011 t *8 (E.D. Ky. May 13, 2008) (distinguishing *Blankenship* in which the evidence established the claimant's impairments progressively worsening over time, to the plaintiff's medical evidence, which did not establish that his depression and back pain actually were progressively worsening).

  The next issue is whether ALJ Jacobs erred in rejecting, or placing little weight, on the medical source statement (mental) prepared by psychiatric nurse Ward on June 25, 2012 (Tr. 836-837). As noted, Hartman argues that substantial evidence does not support the decision of the ALJ to reject the consistently severe, nonexertional limitations imposed by APRN Ward on Hartman's ability to understand, remember and carry out instructions and respond appropriately to supervision, co-workers and work pressures. (Tr. 836-37). ALJ Jacobs rejected this medical source statement based on Hartman's extremely limited mental health treatment record, the absence of any indication of manifested mental illness in the extensive emergency room treatment records and the assessment of the state agency nonexamining psychologists, who found no such severe nonexertional limitations based on Hartman's bipolar disorder, PTSD, ADHD, anxiety and learning disability. The question therefore is whether ALJ Jacobs had a substantial basis on which to reject the medical source statement of APRN Ward (Tr. 29, 836-837).

  First, the answer to this question does not invoke the treating source rule under which acceptable medical sources are to be accorded controlling weight if their opinions are well-supported by medically accepted clinical and laboratory diagnostic techniques and are not inconsistent with other substantial evidence in the record. See 20 C.F.R. §404.1527(d)(2); SSR

96-2p. A nurse practitioner is not considered to be an "acceptable medical source" but rather falls within the category of "other sources" as defined by 20 C.F.R. 404.1513(d) and 416.913(d). *See McGowan v. Astrue*, Case No. 1:12-CV-75, 2013 WL 693234 at *7 (E.D. Tenn. Feb. 8, 2013) (While a nurse practitioner is not considered an acceptable medical source under Social Security Regulations, such sources may be relied upon to assess the severity of impairments without violating the treating source rules under §§ 404.1527(d)(2) and 416.927(d)(2)). ALJ Jacobs consequently was not bound to give great weight to the medical source statement of psychiatric nurse practitioner Ward, but could have chosen to give Ward's assessment more weight if the ALJ concluded that it was supported by substantial evidence in the form of the medical records under review. ALJ Jacobs did not conclude so for good reasons in the Court's view.

The totality of the medical records before the ALJ did *not* support the extraordinary nonexertional limitations assessed by APRN Ward. To the contrary, the available medical records gave no indication of any outward manifestation of manic behaviors such as those exhibited by Hartman during his relatively few visits to the Phoenix Health Center. As previously noted, the observations of trained medical personnel at various emergency rooms repeatedly noted Hartman's mood and affect to be normal, as did those Social Security personnel who interacted with Hartman during the DIB application process. In other words, Hartman at no other time exhibited any medically noteworthy pressured speech, expansive or euphoric affect, flight of thought, or mental confusion in his numerous interactions at U of L, Jewish or Norton emergency rooms or in his dealings with SSA personnel.

Further, Hartman by his own reported daily activities exhibited an ability to do

work-related activities far in excess of the severe restrictions imposed by Nurse Practitioner

Ward.  Hartman's nonexertional limitations did not prevent him from taking public

transportation, attending to his daily needs, performing brief periods of work as an electrician,

landscaper and apparently roofer.  He continued by his own testimony to maintain regular

friendships with several friends who visited him on a weekly basis (Tr. 59).  In sum, APRN

Ward's medical source statement of Hartman's ability to do work-related activities (mental) was

correctly found by ALJ Jacobs not to be supported by the administrative record, but rather was

materially contradicted by the record.

This conclusion was reached by two nonexamining state agency clinical

psychologists.  These individuals, Laura Cutler, Ph.D., and Mary Thompson, Ph.D., reviewed the

then-existent evidence of record concerning Hartman's mental impairments (Tr. 107-111, 120-

123, 137-139, 141, 150-152, 154).  The opinions of Drs. Cutler and Thompson, as state agency

nonexamining psychologists, are viewed in the same manner as the opinion of an agency medical

or psychological consultant.  *Jozlin v. Comm'r*, Case No. 12-CV-10999 at *5 (E.D. Mich. Mar.

12, 2013) (citing 20 C.F.R. §404.1527(e)).  Further, " An ALJ may rely upon the opinion of a

non-examiner over that of an examining source when the non-examiner clearly cites the reasons

for his differing opinion." *Jones v. Astrue,* 808 F. Supp.2d 993, 998 (E.D. Ky. 2011)( citing

*Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir.1994)).[30]

---

[30]

     In *Jones*, two non-examining physicians, Drs. Payne and Mukherjee, based on their
review of the claimant's then existing 2007 records, determined that she retained the ability to
perform a medium level of exertional work with only certain limitations related to climbing and
exposure to hazards. *Jones,* 808 F. Supp.2d at 998-99. Neither Payne nor Mukerjee reviewed Jones'
medical records from 2008 or 2009, which contained the opinions of Jones' treating physician, Dr.
Thornberry, who in March of 2009 issued an opinion that imposed severe restrictions on Jones that
if adopted would have precluded all employment, and the 2008 opinion of Dr. Terry Trout that Jones

Here, ALJ Jacobs provided good reasons for the weight that he afforded the opinions of the two nonexamining state agency psychologists.  Drs. Cutler and Thompson both reviewed the available medical records, which they noted were devoid of any indication of manifestations of mental illness of disabling severity during the claimant's documented medical treatment at various emergency rooms.  The absence of any detectable symptoms of manic behavior, euphoric or otherwise inappropriate mood, or mental confusion on repeated occasions during observation by trained medical personnel strongly supports both the conclusions of the nonexamining state agency psychologists, who concluded that Hartman at worst was only moderately impaired, as well as, the ultimate conclusion of ALJ Jacobs in rejecting the medical source statement of psychiatric nurse practitioner Ward.  Accordingly, the Court concludes that ALJ Jacobs properly afforded the opinions of Drs. Cutler and Thompson substantial weight in his analysis at step 4 of the sequential evaluation process.  *See gen., Braun v. Comm'r*, Case No. 1:12-CV-12, 2013 WL 443542 at *7 (S.D. Ohio, Feb. 5, 2013) (ALJ did not err in giving significant weight to the opinion of nonexamining state agency psychologist and less weight to the opinion of claimant's treating source, counselor Laura Rollins, where her assessed

---

was permanently off work.  *Id.*  Because Drs. Payne and Mukherjee did not have the benefit of these important opinions, the district court concluded that the ALJ erred in relying on the opinions of these two non-examining state agency physicians.  *Jones,* 808 F. Supp. at 999.

Unlike what occurred in *Jones*, here Drs. Cutler and Thompson had access to the medical records of the claimant up through January of 2012, or within one month of Nurse Ward's final treatment note dated February 14, 2012 (Tr. 818).  The February 2012 treatment note is materially similar in its observations to Ward's earlier treatment note dated January 17, 2012. (Tr. 820).  In contrast, Drs. Payne and Mukherjee in *Jones* did not have the benefit of two years of medical records, some of which included the restrictions of Jones' treating physician, Dr. Thornberry, which if adopted would have precluded all SGA.  For these reasons, we conclude that *Jones* is materially distinguishable on its facts when it speaks to review of the complete record by nonexamining state agency physicians– particularly where, as here, the unreviewed portion of the treatment record consists of a single examination by an unacceptable medical source.

44

restrictions were based primarily on the plaintiff's own subjective reports that were inconsistent with the remaining portions of the relevant medical records).

This conclusion brings the Court to the final issue raised in Hartman's fact and law summary (DN 12, pp. 14-15). Hartman argues that ALJ Jacobs did not evaluate the impact of Hartman's many emergency room visits on his ability to maintain substantial gainful activity (DN 12, pp. 14-15). Specifically, Hartman points to the testimony of vocational expert Robert Piper, who in response to a question from Hartman's counsel, testified that if Hartman had more than two medically related absences per month, Hartman would be precluded from substantial gainful activity (Tr. 69-70).[31] Hartman concludes that ALJ Jacobs simply failed to address in any fashion this testimony by the vocational expert, testimony that would on its face preclude substantial gainful activity and therefore require a disability ruling in his favor at step 5 of the sequential evaluation process (Id. at 15).

The Court has examined the hearing decision of ALJ Jacobs to determine whether this issue has been addressed. Nowhere in the hearing decision does ALJ Jacobs directly speak to the question of medically necessary, but otherwise excessive, absenteeism and its impact on Hartman's ability to perform substantial gainful activity. Certainly, the ALJ does speak

---

[31] From the transcript of the hearing:

Q.  With regard to absenteeism, if a person during the period of Feb. 5, 2010, through January of 2012, missed 77 days of work, would they be able to do any of those jobs you cited?

A.  One second. No. Let me see. Feb. 2010 to January 2012. We're talking about 19 months. 77 days [absent] from work in 19 months. No, that would be excessive absenteeism.

(Tr. 69-70).

generally to Hartman's credibility (Tr. 26-29).  Nowhere, however, does the ALJ make any findings that specifically relate to the question of whether Hartman's treatment history was for medically necessary treatment and whether such history would present an accurate basis on which to project future treatment-related absenteeism from the alternative work identified by the vocational expert.  In this respect, the hearing decision is simply devoid of any findings for the Court to evaluate.

Unfortunately, the fact and law summary prepared by the Commissioner makes no reference whatsoever to this issue, even to argue harmless error in light of the remaining findings of the decision.  At most, the Commissioner merely states, in general fashion, that the hypothetical questions by the ALJ to the V.E. encompassed all of Hartman's limitations so that the V.E.'s testimony constituted substantial evidence to carry the burden of the Commissioner at step 5 of the sequential evaluation process (DN 13, pp. 13-14) (citing *Foster*, 279 F.3d at 356-357).

In light of this situation, the Court is compelled to reverse and remand the case to the Commissioner for further development as the Court cannot evaluate findings on a critical issue where none exist, nor draw inferences from the existent findings on this particular material question.  *See Hill v. Astrue*, 698 F.3d 1153, 1162 (9th Cir. 2012) (remanding claimant's DIB/SSI case to the Commissioner where the V.E. on cross-examination conceded that the claimant would not be able to engage in substantial gainful activity if the claimant missed work 2-to-4 days a month due to panic attacks, and the ALJ failed to include this testimony in his hypothetical); *Martinez v. Astrue*, Case No. 12-CV-3516(SH), 2013 WL 663570 at *5 (C.D. Cal. Feb. 22, 2013) (remanding disability case to the Commissioner based on *Hill v. Astrue*, 698 F.3d at 1162.  Accordingly, the decision of the Commissioner is reversed and remanded pursuant to sentence 4 of 42 U.S.C. §405(g) so that the ALJ may have the opportunity to address this final

unresolved material issue. *See gen., Faucher v. Sec'y*, 17 F.3d 171, 173-174 (6th Cir. 1994)

(discussing the distinction between remands under the fourth and sixth sentences of 42 U.S.C.

§405(g)).


cc:     Counsel of Record